**DEPARTMENT OF EDUCATION, STATE OF HAWAII**
**Plaintiff,**

v.

**CARI RAE S., Student, Defendant.**

**No. CIV. 00–00212SPK/KSC.**

United States District Court,
D. Hawaii.

Aug. 3, 2001.

Pamela A. Toguchi, Deputy Attorney General, Office of the Attorney General, Honolulu, HI, for Plaintiff.

Neva Keres, Hawaii Disability Rights Center, Honolulu, HI, for Defendant.

### ORDER AFFIRMING ADMINISTRATIVE DECISION

SAMUEL P. KING, District Judge.

### INTRODUCTION

The Department of Education of the State of Hawaii ("the State") appeals a February 15, 2000, decision of an administrative hearings officer rendered in favor of Defendant Cari Rae S. ("the Student") in this Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA") action. The hearings officer found that the State violated the "child find" provisions of the IDEA by failing to evaluate the Student for a suspected disability earlier than it did. The hearings officer awarded costs ($6,134 plus accrued interest, totaling $7,713) to the Student that were incurred for treatment, diagnosis and evaluation at Queen's Medical Center during a hospitalization from March 14, 1998 to March 19, 1998. The characterization of the costs for this hospitalization is a key issue in this administrative appeal.

Despite the "child find" violation, the State contends that it fulfilled the IDEA by providing the student a Free and Appropriate Public Education because she subsequently graduated from high school. The State also contests the award of costs incurred during the Queen's hospitalization as not "related services" as defined by IDEA and its implementing regulations.

The issue regarding the definition of "related services" in the context of a violation of the "child find" provisions of the IDEA appears to be one of first impression. The matter was argued on July 27,

2001. Pamela Toguchi appeared for the State; Neva Keres appeared for the Student. For the reasons set forth, the Court AFFIRMS the hearings officer's decision. The Queen's costs were "related services" and the State is responsible for payment.

## FACTUAL BACKGROUND

The Student graduated from Kaiser High School in June of 1999. [Administrative Record ("AR") at 239]. Her graduation, however, did not come easy. In her senior year she took adult education classes in the evening, and in the prior summer (after her junior year) she was in a residential program at Castle Medical Center. During this time she had been classified as "emotionally impaired" for purposes of the IDEA and her education was conducted pursuant to an appropriate Individualized Education Plan. [AR 204]. She was classified as disabled late in her junior year, on May 15, 1998. This classification followed an initial March 12, 1998, School Support Team ("SST") meeting with State and DOE officials. [AR 191]. She was also hospitalized at Queen's Hospital for psychiatric reasons from March 14, 1998 to March 19, 1998. As noted earlier, the costs for this Queen's hospitalization are at issue here.

The case, however, arises out of her prior educational record. A hearings officer found that the State should have identified her for eligibility earlier than May of 1998. He found that the State violated the "child find" requirements of the IDEA. [AR 77–81]. In particular, the record indicates that the Student was ranked near the bottom of her class since arriving in Hawaii from Colorado before her freshman year. (Her cumulative GPA was 1.5 for the 9th grade, 1.33 by the 10th, and 1.243 by the 11th grade.) Upon some consultation with a school counselor, she took a summer school class after her sophomore year, had tutoring, and attended the Sylvan Learning Center. [AR 376]. At some point during this period, her counselor asked her father if she had a learning disability. [AR 379].

She was absent from school many times (e.g., 159 absences in her sophomore year), presumably because of her emotional impairment. According to her counselor, Glee Butts, she was suffering from stress and had numerous "behavioral referrals" from teachers. She developed other disciplinary problems by her eleventh grade. She also exhibited signs of drug usage and behavioral problems related to her relationship with her mother.

At the March 12, 1998, SST meeting with State and DOE officials, her behavioral problems were discussed and the team decided to begin an initial "Chapter 36" evaluation (apparently a reference to Chapter 36 of the Hawaii Administrative Rules regarding special education). Although the details are disputed, Tracy Alcoran, a State social worker from the Department of Health, apparently urged the parents to have the Student tested for drugs during her next emotional outburst. [AR 385, 456–60].

Two days later, on March 14, 1998, the Student was hospitalized at Queen's after locking herself in the bathroom at home and threatening to kill her mother. The incident was evidently precipitated by a confrontation with her mother regarding drug use. [AR 194]. At Queen's, she tested positive for marijuana and was diagnosed as having "oppositional defiance disorder" and "marijuana dependence." [AR 195].

After release from Queen's, she was evaluated by a psychologist and underwent other testing leading to the May 15, 1998 classification as "emotionally impaired." An Individual Education Plan was developed and she continued her education, although it is unclear exactly when she returned to Kaiser High School. During this period, she apparently had family

court problems and spent some time in a detention center. She eventually completed a residential program at Castle Hospital during the summer of 1998. After graduating in June 1999, her parents instituted administrative proceedings in October 1999, seeking payment of the Queen's hospitalization costs. After several days of hearings, a hearings officer issued a decision in favor of the Student on February 15, 2000. The State then filed this action appealing from that decision.

## DISCUSSION

### A. The Individuals with Disabilities Education Act.

The IDEA provides federal funding to help states educate children with disabilities. The federal money requires compliance with certain goals and procedures. *See* 20 U.S.C. § 1412. To qualify, a state must provide a Free and Appropriate Public Education ("FAPE") to each disabled child. *See* 20 U.S.C. § 1412(1) (West 1999). FAPE consists of "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Such instruction and services must comport with an individually-tailored Individual Education Plan ("IEP"), which must be developed under strict statutorily-based procedures. *See* 20 U.S.C. § 1401(11); *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034.

The IDEA defines an FAPE as "special education and *related services*" provided

in conformance with the IDEA. 20 U.S.C. § 1401(8) (emphasis added). This case deals primarily with the definition of "related services" and whether the Queen's hospitalization costs incurred in March of 1998 fall within that definition. The IDEA defines "related services" as follows:

> The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, orientation and mobility services, *and medical services, except that such medical services shall be for diagnostic and evaluation purposes only)* as may be required to assist a child with a disability to benefit from special education, *and includes the early identification and assessment of disabling conditions in children.*

20 U.S.C. § 1401(22) (emphasis added). *See Cedar Rapids Comm. Sch. Dist. v. Garret F.*, 526 U.S. 66, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999) (defining scope of "medical services" exclusion but not addressing "diagnostic and evaluation purposes" exception).

### B. "Child find" Provisions.

The IDEA also places an affirmative duty on states or "local educational agencies" ("LEAs") to identify, locate, and evaluate all children with disabilities residing in the state. 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.125 (2000).[1] Under these

---

1. The IDEA was amended in 1997. *See* Pub.L. 105–17, The Individuals with Disabilities Education Act Amendments of 1997, most of which became effective June 4, 1997. The implementing regulations were subsequently amended on March 12, 1999. *See* 62 Fed. Reg. 55025 (Oct. 22, 1997) (notice of proposed rulemaking) and 64 Fed.Reg. 12405

(Mar. 12, 1999) (final regulations). These amendments, among other things, renumbered pertinent provisions related to the "child find" requirement, which previously were set forth at 20 U.S.C. § 1412(2)(C) (1990) and 34 C.F.R. § 300.128 (1998). The amendments were not retroactive. *See, e.g., Fowler v. Uni-*

"child find" provisions, states or LEAs are required to have in effect policies and procedures ensuring that:

> All children with disabilities residing in the State ... regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.125(a). The "child find" provision applies to, among others, "children who are *suspected* of being a child with a disability... and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.125(a)(2)(ii) (2000) (emphasis added). That is, the child-find duty "is triggered when the [state or LEA] has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability." *Corpus Christi Indep. Sch. Dist.*, 31 IDELR ¶ 41, at 158, No. 105–SE–1298 (Jan. 19, 1999) (citing *Davonne B. v. Houston I.S.D.*, No. 327–SE–596 (Texas H.O. Dec'n, May 2, 1997)). *Cf. W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir.1995) (finding that "child find" duty requires children to be identified and evaluated "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability"). A state or LEA "shall be deemed to have knowledge that a child is a child with a disability if [among other things] ... the behavior or performance of the child demonstrates the need for such services." 20 U.S.C. § 1415(k)(8)(B)(ii).

*fied School Dist. No. 259*, 128 F.3d 1431, 1436 (10th Cir.1997). Nevertheless, for present purposes, the law itself was not significantly changed (although the numbering was); the Court where necessary will apply authorities

## C. Administrative and Court Proceedings.

The IDEA allows parents or guardians of disabled children to "present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). When a parent presents such a complaint, the state must provide "an impartial due process hearing" conducted by an impartial hearing officer. *See* 20 U.S.C. § 1415(f)(1).

Any party who is "aggrieved" by the "findings and decision" of the hearings officer has the "right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). The court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

"Additional evidence" as set forth in section 1415(i)(2)(B) means "supplemental" evidence. *Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1472–73 (9th Cir. 1993). The clause "does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony." *Id.* at 1473. *Ojai* adopted the First Circuit's standard for admission of additional evidence:

> that interpreted pre-amendment "child find" provisions in the prior 20 U.S.C. § 1412(2)(C) (now codified as amended at 20 U.S.C. § 1412(a)(3)(A)) and 34 C.F.R. § 300.128 (now codified at 34 C.F.R. § 300.125).

The determination of what is 'additional' evidence must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo. A practicable approach, we believe, is that an administrative hearing witness is rebuttably presumed to be foreclosed from testifying at trial[.]

*Ojai,* 4 F.3d at 1473 (citing *Town of Burlington v. Department of Educ.,* 736 F.2d 773 (1st Cir.1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

Accordingly, although additional evidence in IDEA review proceedings is allowed, this does not authorize introducing entirely new issues that were not included in the original administrative complaint. *See County of San Diego v. California Special Educ. Hearing Office,* 93 F.3d 1458, 1465 (9th Cir.1996). The district court is to "read the administrative record, consider the new evidence, and make an independent judgment based on a preponderance of the evidence and giving due weight to the hearing officer's determination." *Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 892 (9th Cir. 1995). A reviewing court must consider the administrative findings carefully and seek to respond to the hearing officer's resolution of each material issue. *See Ash v. Lake Oswego Sch. Dist.,* 980 F.2d 585, 587–88 (9th Cir.1992) (citation omitted). After such consideration, the court is free to accept or reject the administrative findings in part or in whole. *Id.* The party challenging the administrative decision bears the burden of proof. *See Clyde K. v.* *Puyallup School District, No. 3,* 35 F.3d 1396, 1399 (9th Cir.1994).[2]

## D. Merits of the "Child Find" Violation.

The hearing officer in this case found a violation of IDEA's child-find provisions. He reasoned that the State had, or should have had, reason to suspect by the Student's Fall semester of 1997 (the beginning of her junior year) that she had a disability and that special education services may be needed to address that disability. [AR 80]. The officer was cited to, and the record reflects, numerous incidents or "warning signs" of an emotional impairment. For example, the Student's parents asked her guidance counselor about private tutoring and the Sylvan Learning Center after the Student failed a class in the ninth grade. [AR 375–76]. The Student had 79 absences during that school year. There were many other "behavioral referrals" by the end of the sophomore year. [AR 578]. During the first semester of her junior year, the counselor testified that the Student was "in danger of failing everything … at this time we realized there was a real problem." [AR 579].

The hearings officer noted that the threshold for "suspicion" is relatively low, and that the inquiry was not whether or not she actually *qualified* for services, but rather, was whether she should be *referred* for an evaluation. [AR 79]. (As set forth earlier, the State ultimately ·determined in May of 1998 that the Student did in fact have an emotional impairment; the State prepared an appropriate IEP and provided

**2.** In this regard, the Student has attached to her brief a bill she received from the Queen's Hospital itemizing costs at issue here. The bill was not submitted earlier, either at the administrative level or at the Rule 16 conference. The State objects to the bill primarily because the Student indicated at the Rule 16 conference that she would not supplement the record. Nevertheless, this is not a new issue, and the Court has considerable discretion to entertain "supplemental" evidence. It will be admitted. The validity or authenticity of the bill is not seriously questioned. The important question is the nature of the services, not the specific items on the bill nor the exact costs incurred.

educational and related services at a residential program at Castle Hospital.)

■ In this administrative appeal, the State in its brief does not specifically challenge the merits of the "child find" violation, or argue that it should not have suspected earlier that the Student should be referred for an evaluation for IDEA services. (In any event, the evidence clearly supports the "child find" violation finding.) Rather, the State points to the fact that the Student eventually graduated with a high school diploma—through special services and an appropriate IEP developed in May of 1998.[3] The State contends that it therefore provided an appropriate FAPE because the Student "benefitted" during her tenure with the DOE. *See Rowley,* 458 U.S. at 198–201, 102 S.Ct. 3034 (the IDEA does not require potential-maximizing education, rather it is to provide a "basic floor of opportunity" to provide benefit to the disabled child). The State's argument is essentially this: Because she "benefitted" in some manner, she received an appropriate FAPE (despite the child-find violation).

The State misses the point. It puts the proverbial cart before the horse. A Free Appropriate Public Education is defined in 20 U.S.C. § 1401(8) as:

special education and related services that -

(A) have been provided at public expense, under public supervision, and without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate... education in the State involved, and

(D) *are provided in conformity with the individualized education program* required under section 1414(d)[.] (emphasis added).

■ While *Rowley* only obligates states or LEAs to provide a "basic floor of opportunity" and "confer some educational benefit," *Id.* at 200, 102 S.Ct. 3034 it also requires a program "individually designed to provide [such] benefit." *Id.* at 201, 102 S.Ct. 3034. In this case, however, the "some educational benefit" standard under *Rowley* is not dispositive, especially if instruction is not provided under an appropriate IEP.[4] No IEP; no FAPE under the *Rowley* standard. *See W.G. v. Bd. of Trustees of Target Range School Dist.,* 960 F.2d 1479, 1485 (9th Cir.1992) (reasoning that "[b]ecause we hold that Target Range failed to develop the IEP according to the procedures required by [IDEA], we need not address the question of whether the proposed partial IEP was reasonably calculated to enable R.G. to receive educational benefits").

■ The record amply supports the hearings officer's conclusion that the State had numerous warning signs much earlier than March 12, 1998, that the Student should be evaluated. It had "reason to suspect a disability, and reason to suspect

---

**3.** Graduation does not moot this case. This is primarily because injunctive-type relief (e.g., further instruction) is not at issue. Rather, the Student is seeking reimbursement for "related services" (medical services for "diagnostic and evaluation" purposes) under 20 U.S.C. § 1401(8), as well as attorneys fees. *See Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 890 (9th Cir.1995) ("The Wartenbergs' claim for reimbursement for the Mardan Center tuition is a live controversy. So, as they concede, is the claim for attorneys'

fees. This case is not moot.") (citation omitted).

**4.** True, procedural flaws do not automatically require a finding of a denial of a FAPE. *See Target Range,* 960 F.2d at 1484. They result in a denial of a FAPE when a student loses an educational opportunity or where such flaws seriously infringe the parents' opportunity to participate in the IEP formulation process. *See id.*

that special education services may be needed to address that disability." *Corpus Christi Indep. Sch. Dist.*, 31 IDELR ¶ 41, at 158. It violated the "child find" provisions[5] by failing to evaluate the Student earlier.

**E. Were the costs incurred during the Queen's hospitalization "related services" within the meaning of 20 U.S.C. § 1401(22)?**

 Given that the State violated the child-find mandate, the more difficult question is whether the award of Queen's hospitalization costs was an appropriate remedy. Were the Queen's costs general "medical services" (which are not "related services" and thus not recoverable) or were they for "diagnostic and evaluation purposes" (which are an exception to the exclusion for medical services and thus recoverable)?

The hearings officer reasoned as follows: The action of the parents following [the March 12, 1998] SST meeting were in essence the beginning of the evaluation of the Child, and the cost should be at the expense of the School District. Under IDEA, related services are "supportive services including ... psychological services ... and medical services, except that such medical services shall be for diagnostic and evaluation purposes only." 34 C.F.R. section 300.24(a). *The services provided to The Child in this situation [the Queen's hospitalization costs] were not related services, the services provided were the beginning of diagnosis and evaluation.* (Emphasis added.)

[AR 80].

Initially, the sentence emphasized above is inconsistent. If—as the hearings officer was obviously finding—the services were recoverable as being for "diagnosis and

evaluation," then the services fall under the statutory definition of "related services." The inconsistency notwithstanding, the Court interprets the hearings officer's decision as awarding the Queen's costs as medical services for diagnostic and evaluation purposes, as allowed in 20 U.S.C. § 1401(8) and 34 C.F.R. § 300.24(a). *See also* 34 C.F.R. § 300.24(b)(4) ("*Medical Services* means services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services") (emphasis in original).

In arguing that the Queen's costs are not recoverable, the State relies on *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings*, 903 F.2d 635 (9th Cir. 1990) and *Butler v. Evans*, 225 F.3d 887 (7th Cir.2000). *Clovis* dealt with reimbursement for hospitalization costs for an emotionally disturbed child incurred at an acute care psychiatric hospital. 903 F.2d at 645. The Ninth Circuit held that such costs were excluded because the services were focused on treating a "medical crisis" rather than a stable condition where supportive services were necessary for providing an education. *Id.* Moreover, the services were incurred before an IEP was developed, and were thus not pursuant to the IEP. "[The child's] program at the hospital was implemented not by the Individualized Education Program (IEP) designed by the school system, but was instead determined by a medical team, supervised by a licensed physician." *Id.* The analysis "must focus on whether [the child's] placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process." *Id.* at 644 (citations omitted).

5. 20 U.S.C. § 1412(a)(3)(A); 20 U.S.C. § 1415(k)(8)(B)(ii); 34 C.F.R. § 300.125(a).

Similarly, in *Butler*, the Seventh Circuit followed *Clovis* and found hospital charges not recoverable, where the child's hospitalization "was prompted by a psychiatric crisis, was not approved by her IEP and occurred at a medical facility that did not provide educational services and had not been approved by the state as her residential educational institution." *Butler*, 225 F.3d at 893. *See also Dale M. v. Board of Education,* 237 F.3d 813 (7th Cir.2001) ("The essential distinction is between services primarily oriented toward enabling a disabled child to obtain an education and services oriented more toward enabling the child to engage in noneducational activities. The former are 'related services' within the meaning of the statute, the latter not.").

Here, the State points out that the Student was hospitalized in response to a "crisis situation" after her mother called the police because the Student threatened to kill her. The police in turn referred the Student to acute care at Queen's. These facts, the State argues, are nearly identical to the situations in *Butler* and *Clovis*.

On one hand, the facts here are closely analogous to *Clovis* and *Butler*. On the other hand, however, those cases are distinguishable because they were not "child find" violation situations. *Clovis* and *Butler* did not involve costs for an initial "diagnosis and evaluation." That is, they did not involve the exception to the exclusion for general medical costs. While it might be true that the Queen's costs were precipitated by a crisis, the Queen's costs were also a significant part of the Student's diagnosis and evaluation as disabled with an emotional impairment and oppositional defiant disorder. If not for the crisis, her disability might never have been treated and she might never have received IDEA services.

Further, one cannot ignore the fact that the Queen's hospitalization happened immediately after the March 12, 1998, School Support Team ("SST") meeting with State and DOE officials. It was at this SST meeting that confrontation of the Student and medical help were discussed. This SST meeting was the beginning of, if not an ongoing part of, the *evaluation* process.

From the record, it is obvious that a key aspect of the Student's disability and its diagnosis and treatment was her drug use. Although there was suspicion of drug use prior to the crisis, the Student and her parents needed to acknowledge, confront, and treat such use. In this regard, although the precise details are disputed, it is clear that the State suggested to the Student's parents during the initial SST meeting that they get her tested for drugs.

For example, the mother testified as follows:

> ... [Tracy Alcoran] said what you've going to have to do is you're going to have to be strong about this. You're going to have to stand your ground on this.
>
> The next time [the Student] gets violent ... you'll have to call the police on that. And you need to get her tested. You know, we've got to find out where we stand here.
>
> Tracy said there's a brand new program at Queen's Hospital downtown. Brand new. And she said you—next time this happens, you call the police, you get her down to that facility down there, and you have them test her.

[AR 385]. Tracy Alcoran testified consistently:

> ... I was told the situation with [the Student] at school as well as at home. And Dad had asked me what he should do—or asked for my suggestion.
>
> And I had given him several suggestions. One of them was that we do a

mental health evaluation to see if she was eligible for services.... [AR 456]

. . . . .

The other, older [sibling] used to be heavy into drugs and all this stuff, and he didn't want the same thing to happen to [the Student]. He didn't think that [the Student] used anything. But I had suggested that if there was a slight possibility or that if he had any sort of concern, then maybe he should drug test her just for peace of mind .... [AR 457]

. . . . .

Question: At this [March 12, 1998] meeting, what advice did you give them as a professional as to how they should respond to [the Student], besides putting her in for an evaluation?

Answer: I told them that if she got violent or Mom felt threatened or Dad was threatened or she ran away or whatever it was, they need to call the police[.] [AR 459]

. . . . .

[w]e needed to go through this [evaluation] process in order for her to be determined eligible .... I gave them all the consent forms. They signed the consent forms. I told them that there would be an evaluation in about six to eight weeks.... and then we would have another case conference meeting to determine if she was eligible for services[.] [AR 460]

Similarly, Tracy Alcoran's notes of the meeting read "Suggested parent drug test her." [AR 167].

The evidence indicates that, prior to the crisis, the Student, parents, and school had not fully confronted the drug problem. The crisis itself was precipitated by such a confrontation. Doctor Carlton's (of Queen's Hospital) report indicates in the "history of present illness" section:

Mother ... accused [the Student] of a variety of things including drug abuse,

methamphetamine abuse. As [the Student] describes it, she then became angry and began to yell, and she locked herself in the bathroom. She then got so angry that she stated that she was going to kill her mother.... *The immediate precipitant to that statement was her parent's wish that she be brought in for a drug screen.*

[AR 194] (emphasis added). At Queen's Hospital, the Student admitted to Dr. Carlton to marijuana and other drug use. Dr. Carlton's diagnoses were "Marijuana dependence, oppositional defiant disorder, family discord." [AR 195].

Similarly, a subsequent psychological evaluation of April 3, 1998 documented the precipitating cause of the Queen's hospitalization to be the parents' confrontation with the Student about letters the mother found discussing marijuana use. [AR 198] ("When [the parents] confronted [the Student] ... [she] became very upset and allegedly threatened to kill [the mother]"). That evaluation also concluded that "[the Student] appears to meet criteria for an Oppositional Defiant Disorder[.]" [AR 200]. The stay at Queen's Hospital, was—as the hearings officer found—the beginning of, if not an integral part of, the "evaluation and diagnosis" of the Student. This notwithstanding that it was also care in response to an immediate medical crisis situation. Again, on May 15, 1998, the Student was subsequently found to be eligible for IDEA services.

As a remedy for a substantive violation, the Court is authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii). The statute thus "confers broad discretion" on the Court and allows for reimbursement for costs of pre-eligibility private placements (e.g., private schools), if an IDEA violation is found and a child is subsequently determined to be eligible for

IDEA services. *Burlington School Comm. v. Massachusetts Dep't of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). *See also Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 10, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (reimbursement for unilateral private placement authorized even if private school is not "approved" by state, if state or LEA fails to offer appropriate IDEA services).

Similarly, authorities have approved reimbursement for costs of private placements for "child-find" violations, if a child is subsequently determined to be eligible for IDEA services. *See Doe v. Metropolitan Nashville Public Schools*, 133 F.3d 384, 388 (6th Cir.1998) ("In cases where the lack of dialogue stems from the school district's failure to conduct sufficient 'child-find,' reimbursement may be appropriate"); *Hoffman v. East Troy Comm. Sch. Dist.*, 38 F.Supp.2d 750, 761–62 (E.D.Wisc.1999) (authorizing reimbursement for unreasonable violations, including child-find violations, but concluding under those facts that violation was not sufficiently serious to deny FAPE).

It is a logical extension of existing authority to find pre-placement medical costs limited to diagnosis and evaluation to be recoverable where the child is subsequently found to qualify for IDEA services. Indeed, in some respects, "diagnostic and evaluative" medical costs—which are specifically authorized under the statute—are necessarily "pre-placement" costs. Further, there is limited existing authority allowing for such reimbursement of certain medical costs in a child-find violation situation. *See Manchester Sch. Dist. v. Charles M. F.*, 1994 WL 485754, *7–*8 (D.N.H. 1994) (allowing reimbursement for inpatient psychiatric and psychological hospitalization costs where costs were "for evaluative purposes to determine the proper educational/treatment program" for the child; although comparison was made to

other nonreimbursable services which "were necessitated by violent and uncontrollable fluctuations in ... behavior ... [that] were primarily medical in nature").

## CONCLUSION

On balance, the approximately $8,000 in Queen's costs were necessary for a proper evaluation and diagnosis. The costs are "related services" within the meaning of 20 U.S.C. § 1401(22), especially given the "child find" violation and that the Student was subsequently found to be emotionally impaired and thus qualified for IDEA services. *See Burlington*, 471 U.S. at 369, 105 S.Ct. 1996. The Court therefore agrees with the award of the Queen's Hospitalization costs to the Student. The hearings officer's decision is AFFIRMED.

IT IS SO ORDERED.