**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 25, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

MYISHA GARCIA,

        Plaintiff-Appellant,

v.

BOARD OF EDUCATION OF
ALBUQUERQUE PUBLIC
SCHOOLS,

        Defendant-Appellee.

No. 07-2041

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-05-0062-WPJ/WPL)**

---

Gail Stewart of Steven Granberg, P.A., Albuquerque, New Mexico, for Plaintiff-Appellant.

Samantha M. Adams (Michael L. Carrico with her on the brief) of Modrall Sperling Roehl Harris & Sisk, P.A., Albuquerque, New Mexico, for Defendant-Appellee.

---

Before **BRISCOE, GORSUCH,** and **HOLMES**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Jessica Garcia, on behalf of her daughter Myisha, alleges that the Albuquerque Public School District failed to formulate an individualized education program for Myisha in the Fall semester of 2003, in violation of the Individuals with Disabilities Education Act. By way of remedy, the Garcias seek certain compensatory educational services. The district court, though acknowledging the school district's procedural deficiency, held that no such services should be awarded as a matter of equity because, among other things, Myisha has dropped out of school, demonstrated an unwillingness to return to school, and could essentially receive the very services she seeks simply by re-enrolling in school. On appeal, we do not excuse the school district for neglecting its statutory duties to Myisha, but neither can we say that the district court abused its discretion in exercising its traditional equitable powers.

I

A

Although this appeal concerns only the school district's conduct in Fall 2003, the parties' initial administrative dispute extended to Myisha's education in prior school years as well. Because the district court's remedial decision relied on the full record developed by the parties, an appreciation of that record is essential to our own analysis.

The genesis of this case takes us back to 1999, when, while in fifth grade, Myisha was diagnosed with a specific learning disability affecting her reading

abilities. This diagnosis qualified Myisha to begin receiving special education services under the Individuals with Disabilities Education Act ("IDEA" or "the Act"), *see* 20 U.S.C. § 1401(3)(A), (30), a federal statute aimed at helping states provide disabled children with a free and appropriate public education ("FAPE"), *see id.* § 1400 *et seq.* In order to provide Myisha with a FAPE, the school district was obligated to develop and implement an individualized education program ("IEP") calculated to meet Myisha's specific educational needs, *id.* § 1414(d), and then to review and revise the IEP annually, *id.* § 1414(d)(4). The school district was also required to involve Myisha's mother in this process. *See generally id.* § 1414.

After her 1999 diagnosis, Myisha's school district did exactly as it should, providing her with IDEA-mandated services and benefits through the creation and annual renewal of IEPs. Despite these efforts, however, Myisha's academic performance began to decline by the time she entered middle school, when she also began to display significant disciplinary problems – tendencies that only escalated as she entered high school in the Fall of 2002.

For the 2002-2003 school year, Myisha enrolled in ninth grade at West Mesa High School, and the school district formulated and approved (in May 2002) an IEP for her freshman year. The IEP acknowledged Myisha's prior behavioral and academic struggles and set out various initiatives to help Myisha overcome them. During the Fall semester, however, Myisha frequently skipped

- 3 -

class, recording 136 unexcused class absences in that semester alone, and did not do well when she did attend class. Myisha also began to engage in significant drug and alcohol use. Making matters worse, on December 10, 2002, Myisha was arrested, apparently for attacking her mother and brother. As a result of the arrest, Myisha spent the Spring semester of 2003 at the Bernalillo County Juvenile Detention Center ("JDC") and the Mesilla Valley Residential Treatment Center.

While Myisha was still at the JDC in August 2003, that institution completed a short, one-page form intended to serve as an interim IEP. Substantively, the interim IEP went no further than evaluating Myisha's abilities as "Reading is good – Needs help in Math," and recommending "Place[ment] in Req-Ed with Support." This interim IEP did not meet the full requirements for annual IEPs under IDEA, as set out in 20 U.S.C. § 1414(d), but it appears the JDC and the school district intended only that the IEP be employed on a short-term basis during Myisha's temporary assignment to the JDC.

After her release from the JDC, Myisha again enrolled in ninth grade at West Mesa High School for the 2003-2004 school year. The school district, however, did not review and revise her IEP prior to the start of school. Indeed, for most of the Fall semester, the staff at West Mesa did not even notice that Myisha lacked an updated IEP. The school district explains this oversight as a result of data entry issues with Myisha's file in the school district's computer

system. Specifically, because the August 2003 interim IEP from the JDC was logged into Myisha's electronic file, the computer system showed that Myisha had a new IEP as of August 2003, apparently leading West Mesa to believe incorrectly, until at least November, that it did not need to revise her IEP for the 2003-2004 school year. Yet, despite apparently lacking guidance from any IEP, the school did enroll Myisha in a curriculum consisting almost entirely of special education courses for the Fall term.

Myisha continued to exhibit serious disciplinary problems, and she recorded 65 days of unexcused absences during the Fall semester. That semester effectively ended for Myisha on December 9, 2003, when she was suspended for the remainder of the term for fighting at school. Though her suspension did not prevent her from doing so, Myisha did not attend any of her final examinations, and, as a result, she failed all of her Fall 2003 classes.

Having finally realized that no IEP existed for the 2003-2004 school year, the school district convened an IEP meeting on December 12, 2003 to create one for the second half of the year. The school district made many attempts to secure Ms. Garcia's attendance at the meeting, but ultimately decided to hold the meeting in her absence after Ms. Garcia failed to return phone calls and letters and in light of her history of missing IEP and other school meetings.

The gathering did produce a new IEP, but Myisha did not attend school at all during the remainder of that school year. In early January 2004, the Garcias

apparently moved to another area within the school district, necessitating that Ms. Garcia obtain for Myisha a transfer to Del Norte High School. Unfortunately, by the time Ms. Garcia requested the transfer, it was too late in the semester for Myisha to earn any credits towards graduation. As a result, it appears that Myisha did not attend any school during Spring semester 2004.

B

In April 2004, Ms. Garcia filed a request for an IDEA due process hearing with the New Mexico Public Education Department, claiming, in essence, that the school district had failed to provide Myisha with the FAPE promised her by IDEA during the 2002-2003 and 2003-2004 school years because the May 2002 IEP (effective for 2002-2003) was inadequate and because there was no IEP in place for 2003-2004 until December 2003.

After taking evidence from the parties, the hearing officer determined that there were at least three irregularities in the school district's actions: (1) the school district failed to implement some of the reading instruction components of the May 2002 IEP; (2) the school district failed to have a new IEP in place for the Fall 2003 semester; and, relatedly, (3) the school district failed to ensure that teachers implemented an IEP during Fall 2003. Despite these irregularities, the hearing officer ruled that the school district's actions did not result in a denial of access to a FAPE because the record failed to show that the irregularities would have made any difference to, or imposed any harm on, Myisha. In the hearing

officer's words, "[a] school cannot provide FAPE to a student who is not there, either physically or by virtue of her attitude." *See* Hearing Officer's Final Decision at 39.

Ms. Garcia appealed to an administrative appeal officer ("AAO") within the New Mexico Public Education Department. The AAO agreed with the hearing officer that the school district's procedural missteps did not constitute a violation of IDEA *per se*, and that Myisha had to "show educational harm or loss of educational opportunity to have been denied FAPE as a result of alleged procedural violations." Admin. Appeal Decision at 28. But the AAO disagreed with the hearing officer that the absence of a current IEP in Fall 2003 did not result in harm or that the lack of an IEP was excusable due to Myisha's poor behavior. The AAO stated in relevant part that the "District's failure to have a current IEP in place in the Fall semester of 2003 . . . cannot be blamed on Student's behavior or truancy. . . . Whether having an IEP in place would have altered the semester experience for Student is pure conjecture as to what might have been." *Id.* at 29. As such, the AAO determined that the school district effectively denied Myisha access to a FAPE in the Fall of 2003. By way of an equitable compensatory award, the AAO ordered the school district to conduct a new and independent evaluation of Myisha's needs and to develop a reading program for her based upon the evaluation's findings.

While the administrative appeal was pending, Myisha enrolled again in the ninth grade – this time at Del Norte High School – for the 2004-2005 school year. Before the school year began, the school district conducted a comprehensive evaluation of Myisha and developed a revised IEP. During this third attempt at ninth grade, Myisha displayed a remarkable change of attitude and performance; Myisha consistently attended school, did well in every class, and achieved a 4.0 grade point average for the year.

The school district also developed and implemented a revised IEP for the 2005-2006 school year, Myisha's sophomore year. Unfortunately, however, Myisha seemed to return to her prior habits, frequently skipping class and using drugs and alcohol. Three days before the end of the Fall 2005 semester, Myisha's mother kicked her out of the family's home. Since that incident, Myisha has not regularly attended school for any material period of time, although, with the aid of her attorney, she was at least formally re-enrolled at another high school (Highland) for the 2006-2007 school year. *See* Dist. Ct. Op. at 25 n.6.

C

Following the AAO's decision, Ms. Garcia brought suit in federal court, claiming that the AAO should have found further violations of IDEA and that the compensatory education awarded by the AAO was insufficient. The school district, meanwhile, sought reversal of the AAO's order.

The district court ruled in favor of the school district on all scores. On the merits of whether the school district effectively denied Myisha a FAPE, the district court, much like the original hearing officer, reasoned that it was Myisha's own behavior, rather than the school district's procedural deficiencies, that caused any loss of educational opportunity in Fall 2003, and that the school district therefore had no liability under IDEA. Dist. Ct. Op. at 21-24. Alternatively, the district court held that, even had the school district's procedural failures harmed Myisha and the school district was liable for that harm, no award of compensatory educational services was warranted as a matter of equity in light of the fact that Myisha had demonstrated a pattern of failing to use the educational opportunities provided to her by the school district despite the district's "exceptional" efforts to re-engage her in school. *Id.* at 24-26. According to the district court, "[t]here is no basis for granting what is essentially equitable relief to someone who neither deserves it nor wants it." *Id.* at 25.

In reaching its result, the district court also stressed that the compensatory educational services the Garcias sought through court award would effectively be available to her if and when she should simply decide to return to school. *Id.* at 25-26. For example, the Garcias asked the court to order an "educational reevaluation [of Myisha] . . . and [] educational planning" with an independent expert. *See* Appellant's App. at 348. Yet, IDEA already provides for objective educational evaluations and for educational planning based on those evaluations.

- 9 -

20 U.S.C. § 1414(a)-(d). Similarly, the other remedial measure sought by the Garcias – that the state pay for Myisha's placement outside of the traditional public high school setting if such a placement is necessary to enable her to progress towards graduation – is also already guaranteed to public education students by IDEA. *See id.* § 1412(a)(10)(B).

On appeal, the Garcias challenge the district court's disposition only with respect to whether the school district failed to provide Myisha with a FAPE in Fall 2003 and whether equitable compensatory relief is warranted for that failure. For its part, the school district defends the correctness of the district court's reasoning, and it also raises the question of mootness, arguing that there is no active controversy that need be resolved because Myisha has shown a lack of desire to return to school or take advantage of any compensatory education services that might be awarded as a result of this litigation.

## II

We must address the question of mootness first "because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996). To satisfy the case or controversy requirement of Article III, and thus to justify a federal court's jurisdiction, the parties' dispute must not only be live at the time the suit is filed, but the parties "must continue to have a personal stake in the outcome of the lawsuit" throughout the various stages of litigation. *Lewis v.*

*Continental Bank Corp.*, 494 U.S. 472, 478 (1990) (internal quotation and citation omitted). In essence, "[t]his means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation and citation omitted).

The school district contends that this appeal is moot because Myisha is now nineteen years old, is no longer compelled under state law to attend high school,[1] and has expressed little or no desire to return to school or to continue her education. In other words, because little evidence exists indicating that Myisha intends to take advantage of any benefits she might be awarded from this suit, the school district believes there is no active case or controversy to be resolved.

We cannot agree. If the Garcias' allegations are true, then Myisha suffered an actual injury (deprivation of a FAPE), at least for the Fall 2003 semester. And this is a kind of injury that Congress has authorized the federal courts to remedy, stating that a district court shall "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Indeed, pursuant to the statutory grant of remedial discretion, courts have commonly awarded exactly the kinds of compensatory educational services that the Garcias seek in this suit. *See generally* Allan G. Osborne, Jr., *Remedies for a School District's Failure to*

---

[1] New Mexico mandates school attendance until a student reaches the age eighteen or graduates. *See* N.M. Stat. § 22-12-2.

*Provide Services Under IDEA*, 112 Ed. Law Rep. 1, 9-11 (1996); *see also G ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 309 (4th Cir. 2003) (collecting cases approving compensatory education awards).

It seems to us that the school district rests less on an assertion that we are powerless to issue a compensatory remedy in this case and more on a prediction that Myisha is *unlikely* to take full advantage of any such award. But while the school district's predictive assertions about what Myisha may or may not do in the event she prevails in this litigation may be relevant in assessing whether equitable relief is warranted – a very different question we take up later – they are beside the point for purposes of assessing mootness. For this case to be considered live, it is enough that the Garcias have alleged an actual injury traceable to the school district for which we *can* issue a remedy. After all, when a plaintiff brings suit for damages, the fact that he or she is not likely to make "good use" of any ultimate compensatory award hardly means we are without jurisdiction to entertain the claim.

Informative by way of contrast is a pair of our prior cases, *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.3d 1090 (10th Cir. 2001), and *Moseley v. Bd. of Educ. of Albuquerque Public Schs.*, 483 F.3d 689 (10th Cir. 2007). In those matters we emphasized two factors that, together, suggested mootness in the IDEA context: (1) the claimant has graduated from high school and thus has become ineligible to receive continuing benefits under IDEA; and (2) the claimant seeks prospective

relief.  *See T.S.*, 265 F.3d at 1092; *Moseley*, 483 F.3d at 692-94.  When both factors are present, any court decision on the merits in those cases would, we held, "have no effect on the present or future actions of either party" because the only relief sought is relief that the student can no longer – and in most instances, need no longer – receive.  *Moseley*, 483 F.3d at 693; *see also Honig v. Doe*, 484 U.S. 305, 318 (1988).

In Myisha's case, however, not only is she statutorily eligible to receive IDEA benefits (being nineteen years old and not graduated), but she seeks compensatory rather than prospective relief, complaining not about the entitlement to future benefits but instead seeking a remedy for past wrongs.  In both *T.S.* and *Moseley*, we implied that such a claim would likely not be moot.[2] And for good reason:  after all, if a student has not graduated and is still eligible to receive IDEA benefits in the future, seeking future-oriented relief is hardly a moot point.  Likewise, even if a student is ineligible going forward under IDEA, seeking backward-looking relief to make up for past deprivations also seems

---

[2]  *T.S.*, 265 F.3d at 1092 ("This rule applies, of course, only where a student does not contest his graduation, and where he is seeking only prospective – rather than compensatory – relief."); *Moseley*, 483 F.3d at 694 (dismissing the claim as moot only because claimant "failed to request either reimbursement or compensatory education services in his complaint").

entirely appropriate.[3]  Far from indicating that such a case is moot, then, our precedent tends to confirm that this controversy is very much live.

III

A

Turning to the district court's disposition of Myisha's claim on the merits, we begin by reiterating what is *not* before us.  Although the Garcias initially claimed deprivations of a FAPE in both the 2002-2003 and 2003-2004 school years, on appeal they limit their challenge to the Fall 2003 semester.

On the question of liability for that term, the Garcias contend that the school district violated IDEA by failing to formulate and implement an IEP, and that this failure resulted in an effective denial of a FAPE to Myisha.  The school district responds by arguing that the tardiness in formulating an IEP for Fall 2003 was merely a procedural irregularity that did not cause any substantive harm or comprise an effective denial of a FAPE.  In pressing its position, the school district emphasizes that it provided Myisha with special education services even in the absence of an updated IEP and that Myisha's behavioral problems

---

[3]  For example, the Supreme Court has acknowledged that a claim seeking reimbursement for past education expenses is not moot even if the student has graduated from high school.  *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 55 (2005).  Several of our sister circuits have applied the same logic to claims seeking compensatory education services.  *See Barnett v. Memphis City Schs.*, 113 F. App'x 124, 127 (6th Cir. 2004) (collecting cases).

prevented her from receiving any benefit from an updated IEP even had there been one.

We approach this dispute mindful, as always, of our standard of review. By statute, Congress has set out rather unique rules governing the review of liability in IDEA claims. Unlike the deferential review typically afforded to administrative adjudication of statutory claims, Congress requires district courts to apply a modified *de novo* standard when reviewing agency disposition in the IDEA context. *See* 20 U.S.C. § 1415(i)(2)(C); *Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 927 (10th Cir. 1995). Specifically, the district court must (1) receive the record of the administrative proceedings, (2) hear additional evidence at the request of a party, and (3) base its decision on the preponderance of evidence. 20 U.S.C. § 1415(i)(2)(C). At the same time, though the statute specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that "due weight" must be given to the administrative proceedings, *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982), the fact findings of which are "considered *prima facie* correct," *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004). On appeal of the district court's judgment on the record, we are bound to apply these very same principles of review. *Nebo Sch. Dist.*, 379 F.3d at 974.

Bearing this standard of review in mind, we turn to the two-step inquiry set out by the Supreme Court as our test for assessing liability: (1) Has the school district complied with the procedures set forth in IDEA? (2) Are the special education services provided to the student reasonably calculated to enable the child to receive educational benefits – or in other words, has the school district fulfilled its obligation to provide the student with a FAPE? *Rowley*, 458 U.S. at 206-07.

While "a failure to meet [either] one of these considerations may result in court ordered relief," *Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1120 n.4 (10th Cir. 1999), the type of relief sought will often determine which of the two considerations is dispositive in a particular case. For example, where a school district has allegedly failed to comply with a procedural requirement of IDEA and the plaintiff seeks only an order mandating prospective compliance, then question (1) (whether the school district complied with IDEA's procedural requirements) may be the crucial inquiry, while question (2) (whether the school district provided a FAPE) may often be irrelevant because the claim seeks only to vindicate the student's *procedural*, rather than *substantive*, rights under IDEA. But where, as here, only compensatory relief is sought, the pivotal question is (2), because an award of compensatory education vindicates the student's *substantive* right to receive a FAPE and compensates for a past deprivation of educational opportunity rather than a deprivation of purely procedural rights. *See Urban v.*

*Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 726-27 (10th Cir. 1996); *cf.*

*Erickson*, 199 F.3d at 1122-23 ("[C]ompensatory education is not an appropriate

remedy for a procedural violation of the IDEA.").  Of course, where a procedural

violation is alleged to have caused the substantive deprivation of a FAPE (the

case here), question (1) still bears obvious significance.

In this appeal, the school district does not dispute that it failed to comply

with IDEA's procedural requirements in Fall 2003.  For that reason, and because

the award of compensatory education that the Garcias seek depends primarily on

question (2) of our *Rowley* analysis, we proceed directly to consider that question

– namely, whether such a failure resulted in an effective denial of FAPE for

Myisha.  Or, more precisely, whether the procedural defect of not having a

current IEP in place in Fall 2003 amounted to a substantive failure to "provid[e]

personalized instruction with sufficient support services to permit the child to

benefit educationally from [the school]." *Rowley*, 458 U.S. at 203.

B

Both the hearing officer and the district court held that, in light of Myisha's

truancy and behavioral problems, as well as the school district's provision of

remedial classes to Myisha, the school district's failure to conduct an IEP for the

Fall 2003 semester was immaterial.  Meanwhile, the AAO believed that no such

conclusion could be certain because, had the school district developed a new IEP

at the start of the term, it might have helped Myisha improve her behavior and

achieve the sort of success she found in 2004-2005.  As the disunity of these opinions indicate, the answer to the liability question in this case is not altogether free from doubt.

Adding to this doubt is the fact that the Garcias challenge the district court's decision on two grounds that do not appear to have been squarely addressed previously in this circuit or others.

First, the Garcias argue that the lack of an IEP during most of the Fall 2003 term constitutes a *per se* denial of FAPE.  This argument seems, at first blush, to run headlong into our precedent holding that procedural failures under IDEA amount to substantive failures only where the procedural inadequacy results in an effective denial of a FAPE.[4]  But the Garcias pose a slightly different and subtler question that we have never fully confronted.  They assert that, because the IEP is the central vehicle that Congress created to deliver FAPE to disabled children and the focal point of court review under *Rowley*, the *total* lack of an IEP for a school term, as opposed to merely a defective IEP, is more than a technical deficiency; rather, its entire absence forecloses any possibility that the school district adequately provided a FAPE and also prevents effective court review of a school district's compliance with IDEA.

_____

[4] *See T.S.*, 265 F.3d at 1095 ("Procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of educational opportunity."); *Urban*, 89 F.3d at 726 ("Technical deviations . . . do not render an IEP entirely invalid; to hold otherwise would 'exalt form over substance.'") (internal citation omitted).

In aid of this argument, the Garcias cite to two cases in which the absence of an IEP was found to be a substantive denial of a FAPE. *See Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 766 (6th Cir. 2001); *Dep't of Educ. v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1196-97 (D. Haw. 2001). But these cases dealt with yet another, slightly different factual scenario where no IEP was *ever* developed or implemented for the plaintiff-student. Here, of course, the school district violated IDEA not by failing *ever* to prepare an IEP for Myisha, but by failing to update her IEP in the annual, timely fashion the statute requires. Also, apparently unlike the cases cited by the Garcias, the school district in this case provided Myisha with a full curriculum of special education classes even in the Fall 2003 semester so that it remains unclear from our record whether any additional or different services would have been provided had Myisha's IEP been revised before that term began.

Second, the Garcias argue that Myisha's behavior cannot be used to defeat the school district's liability under IDEA. And this, too, presents us with a thorny and uncertain path. On the one hand, we acknowledge potential pitfalls in deeming harmless procedural violations of IDEA for students who fail to exhibit enthusiasm for school. After all, a student's lack of enthusiasm, at least in some cases, may be related to his or her disability. Such students are perhaps most in need of vigilant attention from their schools, and there is at least the possibility that, had the school district reassessed Myisha's needs and implemented a new

IEP at the start of the Fall 2003 semester, the school might have been successful in helping Myisha to overcome her behavioral tendencies and to increase her commitment to school – a possibility not entirely out of the question on this record in light of the potential Myisha demonstrated in 2004-2005, the very next school year.

On the other hand, liability under IDEA is determined not by imagining the possibilities of what might have been, but rather by determining whether the preponderance of the evidence indicates that the school district's procedural failures resulted in a denial of educational benefit to the student. As the district court points out, such an inquiry implicitly seems to require determining whether the school district's actions *caused* the student to suffer an educational loss. And on the facts of this case, there is strong evidence indicating that, regardless of what actions the school district did or did not take in Fall 2003, Myisha's poor attitude and bad habits would have prevented her from receiving any educational benefit. *See, e.g.*, Hearing Officer's Decision at 39 (summarizing Myisha's patterns of behavior that contributed to her poor attendance and performance).

Having acknowledged that the Garcias' appeal on liability poses novel questions of law, we ultimately think the wisest course is to decline to answer them definitively in this case. We do so because there appears to us a narrower ground for decision, one based on the district court's alternative remedial holding,

and one more clearly dictated by our precedent.  Accordingly, we leave for another day the questions of liability posed here.

IV

Instead, assuming (though without deciding) the school district's liability, we turn to the question of remedy.  In addition to basing its denial of relief on its holding that the school district's procedural deficiencies did not harm Myisha and thus give rise to liability, the district court also, and alternatively, denied relief in light of various equitable considerations it identified.  Because the district court's remedial decision is entitled to abuse of discretion review, and because the district court's discretion extends to denying relief for the reasons the court stated in its disposition of Myisha's claim, we are compelled to affirm its judgment.

A

The school district asserts, and the Garcias do not deny, that, while our standard of review in assessing liability is rather searching, our review of the district court's remedial decision is limited to assessing only whether it amounts to an abuse of discretion.  And, indeed, the plain language of IDEA accords district courts broad discretion in determining relief for successful IDEA claims, stating that a district court "shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  The Supreme Court, when examining this statutory text, has echoed the point, declaring that "[t]he ordinary meaning of these words confers broad discretion on the court," *Sch. Comm. of*

*Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 369 (1985), and explaining that the words of the statute "mean[] that equitable considerations are relevant in fashioning relief," *id.* at 374; *see also Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993) (recognizing that IDEA authorizes courts to "fashion[] discretionary equitable relief").

Where Congress affords equitable discretion to the district court, we traditionally limit ourselves to reviewing only for "abuse" of that discretion. "When Congress leaves to the federal courts the formulation of remedial details, it can hardly expect them to break with historic principles of equity in the enforcement of federally-created equitable rights." *Holmberg v. Armbrecht*, 327 U.S. 392, 395 (1946). This is not to say that Congress cannot alter the federal courts' traditional equity practice by specifying a standard of review other than abuse of discretion if it so chooses; of course it may. But no such congressional intention is manifest in the text of IDEA, and the parties suggest none. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("Congress may intervene and guide or control the exercise of the courts' [equity] discretion, but we do not lightly assume that Congress has intended to depart from established principles.").[5]

---

[5] Unsurprisingly, our application of abuse of discretion review to remedial determinations under IDEA accords, as best we can tell, with the holdings of every federal circuit court to have articulated a standard of review in this context. *See Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 25-26 (1st

(continued...)

Identifying abuse of discretion as the proper standard of review, however, gets us only halfway across the river. We must still ask: What does it mean for a district court to abuse its discretion in the context of considering and fashioning remedies under IDEA?

We can begin to identify the contours of this discretion by considering what a district court *may* properly do in exercising its discretion. First, and obviously based on the statutory text, a district court may grant equitable relief to remedy a demonstrated violation of IDEA. But, perhaps less obviously, a district may also choose to withhold relief despite a demonstrated (or, in this case, assumed) statutory violation if it has a valid basis in equity for doing so. As the Supreme Court has made clear time and again, "[a] grant of jurisdiction to issue [equitable relief] hardly suggests an absolute duty to do so under any and all circumstances." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *see also United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496-97 (2001); *Weinberger*, 456 U.S. at 312-14; *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 193-94 (1978). Absent an "unequivocal" statement by Congress to the contrary, courts retain their traditional equitable discretion, including the authority to simply withhold relief,

[5](...continued)
Cir. 2007); *Lester H. ex rel. Octavia P. v. Gilhool*, 916 F.2d 865, 873 (3d Cir. 1990); *Bd. of Educ. of Fayette County v. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007); *Hale ex rel. Hale v. Poplar Bluffs R-I Sch. Dist.*, 280 F.3d 831, 834 (8th Cir. 2002); *Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006); *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 522, 527 (D.C. Cir. 2005).

when a statutory authorization to grant relief invokes the courts' equity jurisdiction. *Hecht*, 321 U.S. at 329. Given that IDEA contains no such unequivocal statement altering the courts' equity jurisdiction, a district court's discretion encompasses the ability to deny relief based on equitable considerations.

We can further illuminate the scope of the district court's remedial discretion under IDEA by considering what a district court *must* do. The Supreme Court has explained that a court's remedial determination (including a determination to deny relief) under IDEA *must* be "'appropriate' in light of the purpose[s] of the Act." *Burlington*, 471 U.S. at 369. So we necessarily seek to determine whether the district court's equitable decision not to grant relief was "appropriate" in light of IDEA's purposes.

The "principal[]" purpose of IDEA, as outlined by the statute and as confirmed by the Court in *Burlington*, is to provide all disabled children with "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); *Burlington*, 471 U.S. at 369. In addition, IDEA specifies three other purposes: to assist states in implementing a "system of early intervention services for infants and toddlers with disabilities;" "to ensure that educators and parents have the necessary tools to improve educational results for children with disabilities;" and

"to assess, and ensure the effectiveness of, efforts to educate children with disabilities." *Id.* § 1400(d)(2)-(4).

While a court's remedial determination must be appropriate in light of these four purposes, the Supreme Court has not given any guidance as to how a court should rank and weigh what could, in many instances, amount to competing and incommensurate goals or ends. For the task of our appellate review, however, we need only evaluate whether the district court's remedial decision is within the range of reasonable choices in seeking to achieve whichever of IDEA's purposes are implicated in a given case. Fortunately in this instance, only two of IDEA's expressed purposes – the first and last – appear to be at issue in the district court's decision to deny relief to Myisha.[6] We therefore proceed to determine whether that decision was appropriate in light of those purposes.

Turning first to IDEA's primary purpose of providing a FAPE to all disabled children, the district court emphasized that denying compensatory relief in this instance in no way hinders Myisha's access to a FAPE. And ample evidence supports the district court's conclusion. Myisha is, after all, *already* guaranteed the provision of a FAPE at any time she chooses to return to school, so long as she remains eligible to receive benefits under IDEA (that is, until she

---

[6] We reach this conclusion because Myisha is not an infant or toddler and because her suit does not appear to raise any questions about the educational tools that are broadly available to educators and parents (as opposed to the specific services that have or have not been available to Myisha).

- 25 -

reaches 21).[7]  Relatedly, it remains unclear from the record how that provision of a FAPE would differ in any substantive (rather than formal) way from the compensatory relief Myisha seeks in this case.  *See supra* Part I.C.  Neither does denying Myisha relief endanger the provision of a FAPE to other disabled children.  The district court's decision does nothing to indicate that IDEA procedural failures will be tolerated or left unremedied except in limited circumstances involving students who have demonstrated a clear commitment to avoid school and disregard the educational opportunities available to them.

The district court's denial of relief also relied on IDEA's purpose of ensuring the effectiveness of efforts to educate children with disabilities.  After all, the limited resources devoted to providing education benefits for disabled children are not effectively allocated where schools expend resources on students who not only fail to use the educational opportunities provided them but also affirmatively avoid attending school altogether.  Along these lines, the district court emphasized that, regardless of the school district's compliance or non-compliance with IDEA's procedural safeguards, "Myisha has had no interest (with the exception of the 2004-05 school year) in obtaining an education, and . . . continues to have no interest."  Dist. Ct. Op. at 25.  As such, awarding

---

[7]  Were there any concerns that the school district would not provide her a FAPE upon her return, prospective (rather than compensatory) relief to ensure the provision of a FAPE would certainly be appropriate.  But the Garcias have not raised any such concerns or sought such relief.

compensatory relief "just in case Myisha changes her mind about getting an education at some point in the next few years is unnecessary and wasteful." *Id.*; *see also Metro Motors v. Nissan Motor Corp.*, 339 F.3d 746, 753 (8th Cir. 2003) (Hansen, J., concurring in part and dissenting in part) (noting the general maxim that "equity will not help those who do not help themselves").

Ample evidence also supports the district court's conclusion on this score. Despite the school's open doors, Myisha has not regularly attended school since the Fall 2005 semester. She and her mother have affirmatively avoided the school district's attempts to cooperate in formulating new IEPs aimed at assisting Myisha in further progressing in her high school education. *See, e.g.*, Hearing Officer Decision at ¶¶ 15, 27, 62, 64, 65, 116, 117. Additionally, Myisha's significant record of disciplinary problems and truancy, while not justifying the school district's non-compliance with IDEA in Fall 2003, does tend to confirm the district court's skepticism of whether Myisha will in fact choose to benefit from the compensatory services that she might receive from the court. Myisha's superb performance during the 2004-2005 school year also demonstrates that she may well be able to make impressive academic strides simply by re-enrolling in high school, attending regularly, and avoiding the behavioral problems of her past, aided by the special education services that would be available to her should she re-enroll. Finally, as the hearing officer concluded, putting aside the lapse in updating Myisha's IEP in Fall 2003, the school district has for the most part made

diligent and extensive efforts to provide Myisha with whatever special services that could help her in progressing towards graduation, *see* Hearing Officer's Decision at 27, while Myisha has, aside from the 2004-2005 school year, largely rejected those services.

Because the result of and reasons supporting the district court's decision accord with the relevant purposes of IDEA and are supported by the undisputed facts in the record, we cannot say that the court abused its discretion. Of course, this is not to say that, were we making a decision in the first instance, we would necessarily choose the same path the district court took here; neither do we necessarily believe that the district court's path was the only one available to effect the statutory purposes of IDEA. Rather, we simply hold that the district court's decision fell well within the broad parameters of the discretion Congress chose to invest in it.

Now, one might observe that many of the reasons justifying the district court's denial of equitable relief echo the reasons the school district believes this case is moot – namely, Myisha's current refusal to attend school and the demonstrated likelihood that she will not take full advantage of any award the court might have granted. And surely they do. But while these reasons do not indicate that this court is *powerless* to award relief to Myisha, and thus do not suggest this case is moot, they do tend to confirm that the district court operated within the bounds of the discretion afforded to it in concluding that it *should not*

provide relief to Myisha.  So, somewhat analogously, while the fact that a plaintiff's conduct prior to bringing suit may suggest some degree of comparative or contributory fault does not strip the court of subject matter jurisdiction, it can bear relevance when it comes to assessing whether and what relief may be appropriate.

*   *   *

We recognize that Myisha Garcia's troubles have hardly been entirely of her own making.  There is also no doubt that, at least in the Fall of 2003, the school district neglected its statutory responsibilities towards Myisha.  Our decision today should, therefore, not be taken as excusing the school district's actions, or as condemning Myisha for being a poor student.  Rather, our affirmance of the district court's disposition is simply a product of the discretion that Congress reposed in that court.  We cannot say that the court traversed the bounds of that discretion in determining that the relief Myisha seeks is neither necessary nor merited in light of Myisha's educational history and the educational services already available to her should she choose to return to school.

*Affirmed.*