FILED
United States Court of Appeals
Tenth Circuit

**October 8, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

SIMON CHAVEZ and BEVERLY
CHAVEZ, on behalf of their minor
son, M.C.,

      Plaintiffs-Appellants/Cross-
      Appellees,

v.

NEW MEXICO PUBLIC
EDUCATION DEPARTMENT,

      Defendant-Appellee/Cross-
      Appellant.

Nos. 09-2063 and 09-2064

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV 05-0380 JB/RLP)**

Tara Ford of Pegasus Legal Services for Children, Albuquerque, N.M. (Gail
Stewart of Steven Granberg, P.A., Albuquerque, N.M., with her on the brief), for
Plaintiffs-Appellants/Cross-Appellees.

Jeffrey J. Wechsler of Montgomery and Andrews, P.A., Sante Fe, N.M. (Stephen
S. Hamilton and Sharon T. Shaheen of Montgomery and Andrews, Sante Fe,
N.M., with him on the brief), for Defendant-Appellee/Cross-Appellant.

Before **GORSUCH, McKAY,** and **CUDAHY**,[*] Circuit Judges.

**CUDAHY**, Circuit Judge.

This case is about the role of the New Mexico Public Education Department (NMPED) in a high-functioning autistic child's education. That child, M.C., was educated at home for 18 months as his parents, Simon Chavez and Beverly Nelson, and Tularosa Municipal Schools (Tularosa), their local school district, attempted to resolve their differences regarding M.C.'s education through the administrative proceedings of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-82 (2000). Although we will recount some of the factual and procedural background, NMPED's responsibilities to M.C. are based on several issues of statutory and regulatory interpretation and, therefore, we will not spend long on the details of the administrative proceedings which largely addressed the dispute between M.C.'s parents and Tularosa, not a party to this appeal.

I

A

The IDEA's overarching purpose is to ensure that children with disabilities receive a free appropriate public education (FAPE) that "emphasizes special

---

[*]Honorable Richard D. Cudahy, of the Seventh Circuit Court of Appeals, sitting by designation.

education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A) (2000). Because IDEA was enacted pursuant to Congress's Spending Clause powers, the Supreme Court has cautioned that any conditions on a state's acceptance of federal funds must be set out "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295-96 (2006); *but see Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 534 (2007) ("Our determination that IDEA grants to parents independent, enforceable rights does not impose any substantive condition or obligation on States they would not otherwise be required by law to observe."). The IDEA places a variety of obligations on state education agencies (SEA), like NMPED, and on local education agencies (LEAs), like Tularosa.

The IDEA mandates procedures to resolve the inevitable conflicts among students, parents, LEAs and SEAs. The centerpiece of the IDEA is the student's individualized education program (IEP). 20 U.S.C. § 1401(11) (2000). A team of specialists and educators must develop for each student covered by the IDEA an IEP to guide his education. "The IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1043 (10th Cir. 1993). If they are unhappy with the outcome, the student's parents may file a complaint to challenge the IEP through

a due process hearing which, in New Mexico during the relevant time period, began with a hearing before an impartial Due Process Hearing Officer (DPHO) and concluded with an appeal to an Administrative Appeal Officer (AAO). 20 U.S.C. § 1415(g) (2000); NMAC 6.31.2.13(I)(16) (2000).

M.C. was enrolled at Tularosa Middle School in the fall of 2003 for his sixth-grade year. Tularosa's middle school had no self-contained classrooms for students like M.C., and so it placed M.C. in a classroom with non-disabled students, accompanied by an aide. Thereafter, M.C. began refusing to go to school. Later in September of 2003, his parents requested an IEP meeting. At the meeting, the parents noted the problems they had convincing M.C. to leave his house for school and asked Tularosa to send someone to their home to help them. Tularosa refused to modify M.C.'s IEP to send staff to enter their home and to "walk" (essentially, to carry) M.C. out the door, because it claimed that such a service was outside its purview, although Tularosa did agree to provide transportation from M.C.'s home to school. Even though M.C. was not in school, Tularosa sent him homework until late September, when it dropped him from the rolls. M.C. did not attend school at Tularosa from October 2003 until the close of the administrative proceedings involving Tularosa and the parents.

The parents took some steps to notify NMPED about their troubles with Tularosa. In late September 2003, the parents mailed NMPED an "informal letter of complaint" in which they explained that Tularosa refused to modify M.C.'s IEP

and that it had stopped sending homework home. The parents explained to NMPED "[w]e understand that in writing this letter that we are still keeping our complaint at the local level." App. at 2145. They requested no direct action from NMPED beyond "look[ing] forward to hearing from" it, and they informed NMPED that they were home schooling their child until the situation was addressed because M.C. was dropped from school. *See id*. at 2146. The parents also followed up with a phone call in which Ms. Nelson spoke with Duane Ellis, the Special Education Bureau parent liaison. Ms. Nelson requested the forms for a due-process hearing from NMPED, and she remembers discussing her letter, which had not yet arrived. Ellis discussed the matter with Tularosa and provided some caselaw in support of Tularosa's position that it had no obligation to cross the threshold of the parents' home but also suggested alternative solutions, including consultation with the Southwest Autism Network Clinic (SWAN) or other school districts about providing education in the home.[1] Ellis claims that he was not aware from the parents that M.C. was not being provided any education

---

[1] *See Ind. Sch. Dist.*, 17 EHLR (LRP Pubs.) 21 (Minn.) (holding that school district was not required to carry up to her house a non-ambulatory student who had cerebral palsy, epilepsy and unspecified mental handicaps); *City Sch. Dist. of City of N.Y.*, 1986-87 EHLR Dec. (CRR Pub. Co.) 508:282 (N.Y. Nov. 19, 1986) (holding that district was not required to enter a home to assist a non-ambulatory student, distinguishing circumstances in which the district provides trained medical professionals to enter the home for children with more severe difficulties).

and, had he been so aware, he would have contacted Tularosa that day to explain that it needed to address the situation.

The parents took several actions to try to return their son to an educational environment prior to initiating a due-process hearing about M.C.'s education. The parents had M.C. evaluated by SWAN in December 2003. The IEP team met again in March 2004 to consider the preliminary evaluation, but declined to offer M.C. the residential placement the parents requested.

In May 2004, the parents filed a due process complaint against Tularosa and NMPED for violations of the IDEA and the Rehabilitation Act. NMPED appointed a DPHO to hear their claims.[2] NMAC 6.31.2.13(I)(6)(a) (2000). NMPED claimed it was not properly before the DPHO, who agreed, and NMPED refused to accept the parents' claims against NMPED. After an evidentiary hearing, the DPHO found that Tularosa had denied M.C. a FAPE during the 2003-04 and 2004-05 school years because it failed to amend his IEP to address his refusal to attend school. Tularosa and the parents appealed to an AAO, appointed by NMPED. The parents challenged the DPHO's decision to exclude NMPED from the administrative proceedings and certain aspects of the remedy, and Tularosa contested the determination that it had denied M.C. a FAPE. In a March 2005 decision, the AAO generally affirmed the DPHO's decision and agreed that

_____

[2] As of May 2004, Ms. Nelson admitted that neither she nor anyone acting for her had asked NMPED to intervene and directly provide educational services for M.C.

Tularosa had failed to provide M.C. educational services since October 2003. She ordered Tularosa to provide services to M.C. and noted that, "[o]nly if [Tularosa] is unable to comply with this order, will it become clear that [Tularosa] is unable to serve [M.C.] effectively." AAO's Dec. 15 (Mar. 4, 2005), A.R. 330. The AAO agreed with the DPHO that NMPED should not be part of the administrative proceedings. Importantly for this appeal, the AAO held that "[a]t this time, it appears that [Tularosa] can implement the remedy ordered by the [AAO] for [M.C.]." *Id*. at 15. NMPED did not challenge any of the findings made in the administrative proceedings against Tularosa. *Chavez v. Bd. of Educ. of Tularosa Mun. Sch.*, 614 F. Supp. 2d 1184, 1194 (D. N.M. 2008).

M.C. returned to school in the summer of 2005 and remained there through the end of the summer of 2006 when M.C. and his parents moved to Albuquerque. Eventually the state reimbursed Tularosa approximately $146,000 of the $165,000 it cost to educate M.C. while implementing the AAO's order.

The parents filed a complaint in the district court alleging claims against both Tularosa and NMPED, requesting equitable relief, including reimbursement for the efforts of M.C.'s mother to keep M.C. at grade level while he was out of school, and seeking injunctive, declaratory and compensatory education, including systemic relief to ensure across New Mexico proper monitoring of children with autism and an adequate continuum of alternative placements for M.C. Tularosa settled with the parents, was dismissed from the case and is

- 7 -

therefore not part of this appeal. As for NMPED, the parents alleged that it was directly responsible for the provision of education to M.C., pursuant to 20 U.S.C. § 1413(h)(1) and 34 C.F.R. § 300.360. 1st Am. Compl. ¶ 19. In addition, they alleged that NMPED failed to offer appropriate placements for M.C. and other children with autism. *Id*. at ¶¶ 52, VII.9. Lastly, they alleged that NMPED failed to enforce the IDEA by supporting Tularosa's refusal to develop an appropriate program for M.C. *Id*. at ¶¶ 21, 44.

The district court eventually held that NMPED denied M.C. a FAPE by failing to provide direct services to M.C. as required by the IDEA, 614 F. Supp. 2d at 1213, but declined to intervene in the state's provision of educational services and to order systemic relief. *Id*. at 1214. In addition, the district court held that the relief requested by the parents, a hotline to allow parents with similar concerns to request assistance from NMPED was unnecessary, compensatory education was duplicative of that ordered by the AAO and reimbursement of $80,000 of Ms. Nelson's education costs was not available because the parents had provided insufficient evidence of their out-of-pocket expenditures, and, therefore, the real harm caused by NMPED was not redressable by a court-ordered remedy. *Id*. at 1214-17. Both parties timely appealed.

## II. Discussion

### A. The parents' claims were properly before the district court.

In its cross-appeal, NMPED argues that the district court lacked jurisdiction over the parents' claims because they failed to exhaust their claims against NMPED in the administrative proceedings and because they were not "aggrieved" by the AAO's decision since the AAO held in their favor on their claims against Tularosa. 20 U.S.C. § 1415(i)(2) (2000)[3] (allowing civil actions for those aggrieved by the IDEA administrative process).

NMPED argues that the parents were not "aggrieved" as there was nothing more they could hope to receive from the administrative process once the AAO ordered Tularosa to comply with a program to provide M.C. a FAPE. *See, e.g.*, *Robinson v. Pinderhughes*, 810 F.2d 1270, 1275 (4th Cir. 1987). This argument misconstrues the thrust of the parents' claims against NMPED. In their Amended Complaint, the parents sought liability against NMPED both because NMPED denied M.C. a FAPE by declining to provide him direct educational services and also because it failed to monitor whether students like M.C. were receiving a FAPE and did not provide training for staff to ensure that autistic students received the appropriate continuum of alternative placements so that these students received a FAPE. Consequently, the parents sought additional liability

---

[3] We apply the 1997 version of the IDEA, in effect until July 2005 because the administrative process in this case began in 2004, and the parents filed their civil action in April 2005. *See Miller v. Bd. of Educ. of the Albuquerque Pub. Sch.*, 565 F.3d 1232, 1235 n.1 (10th Cir. 2009).

and relief from NMPED beyond what they sought (and received) in the administrative process against Tularosa.

This additional requested relief distinguishes the parents' case from *Miller v. Board of Education*. In *Miller*, this circuit declined to allow the parents to present additional evidence they claimed would establish that a local school district was unable to comply with the AAO's order because allowing claims based on a school district's speculative noncompliance with an order would force the courts into questions of educational policy they are ill-equipped to address. *See* 565 F.3d 1232, 1242 & 1243 n.6 (10th Cir. 2009) (holding that the district court did not abuse its discretion when it declined to allow the plaintiff to present additional evidence supporting a claim that the school district would not comply with an order because of systemic dysfunction). In contrast, in the present case, the parents request a finding of liability as to NMPED's failure to intervene earlier and to provide a FAPE to M.C. while he was being home schooled.

And, the parents' theory of liability was not beyond the pale– states may be held responsible for failing to provide services to disabled children. *See, e.g.*, *St. Tammany Parish Sch. Bd. v. La.*, 142 F.3d 776, 785 (5th Cir. 1998) (holding that, pending merits decision, district court could exercise its discretion to require SEA to pay the cost of child's interim educational placement); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 953, 955-56 (4th Cir. 1997) (holding that, in general, an SEA is ultimately responsible for the provision of a FAPE to its students but

remanding to allow the district court to allocate the proper equitable relief between the LEA and SEA); *Kruelle v. New Castle County Sch. Dist.,* 642 F.2d 687, 696-97 (3d Cir. 1981) (upholding the district court's determination that the state is generally responsible for ensuring that the child's needs are evaluated and a plan implemented, but not requiring the state to engage in the student's specific educational program). By its failure to address their claims, the parents could be considered "aggrieved" by the administrative process as implemented by the DPHO and AAO.

Of course, the AAO never addressed the parents' claims against NMPED because NMPED successfully avoided the administrative process despite the parents' attempts to add it as a party. Exhaustion of administrative remedies as a predicate for a federal-court action is not required if exhaustion would be futile or fail to provide adequate relief. *See Romer*, 992 F.2d at 1044; *cf. Honig v. Doe*, 484 U.S. 305, 326-27 (1988) (discussing the general idea of futility in exhaustion); *Romer*, 992 F.2d at 1044 (suggesting that other courts have approved exceptions to the exhaustion requirement for claims that involve questions of law). Thus, regardless whether they were aggrieved by the administrative process, the parents sufficiently attempted to exhaust their claims to open the federal courthouse doors.

**B. The parents' claims against NMPED were ripe.**

NMPED argues in its cross appeal that the parents' claims were unripe. It notes that, since the parents filed their complaint a mere 30 days after the AAO issued its decision, Tularosa still had a reasonable time to comply with the AAO's order and thus any supervisory duties NMPED owed to M.C. had not yet been triggered. NMPED further argues that it breached no duty to the parents at the time they filed their complaint because NMPED had no obligation to directly provide M.C. a FAPE.[4]

To evaluate whether an issue is ripe, a court examines: "(1) the fitness of the issue for judicial resolution and (2) the hardship to the parties of withholding judicial consideration." *United States v. Wilson*, 244 F.3d 1208, 1213 (10th Cir. 2001). A case meets the first prong if it does not involve uncertain or contingent events that may not occur at all (or may not occur as anticipated). *See New Mexicans for Bill Richardson v. Gonzalez*, 64 F.3d 1495, 1499 (10th Cir. 1995) (internal citations omitted). The second prong addresses whether the challenged action is a "direct and immediate dilemma for the parties." *Id*. at 1499 (internal quotations omitted). The ripeness question is primarily one of timing. *See Kan. Judicial Rev. v. Stout*, 519 F.3d 1107, 1116 (10th Cir. 2008); *New Mexicans for Bill Richardson*, 64 F.3d at 1499.

---

[4] The parents filed their complaint within 30 days of the administrative order, a deadline in current state IDEA regulations. *See* NMAC 6.31.2.13(I)(25)(a) (2005).

As with its arguments regarding exhaustion, NMPED uses its ripeness arguments to restate its contention, addressed more fully below, that NMPED had no obligation to provide M.C. with a FAPE directly, which is a separate, merits-based question. While challenges to NMPED's enforcement of the order against Tularosa might have been speculative given that Tularosa had little time to comply with the order, claims related to NMPED's failure to provide direct educational services to M.C. were developed at the point the parents filed suit because M.C. had been denied 18 months of a FAPE, and NMPED arguably knew that M.C. was not receiving any educational services in New Mexico. Withholding judicial review would deprive the parents of a potentially available remedy. Their claims were ripe when filed in the district court.

**C. DPHO's authority to hear claims against NMPED.**

NMPED argues that the district court erred in concluding that the DPHO had authority to hear the parents' claims against NMPED. The district court reasoned that, because the applicable IDEA regulations specify that the parents or a "public agency" may initiate a hearing and because SEAs like NMPED fall within the definition of "public agency," 34 C.F.R. § 300.22 (2004) (defining public agency), § 300.507(a) (due process hearings address disputes between "public agencies" and parents) the parents should have been allowed to include NMPED in the hearings because it had "potential liability under the IDEA." 614 F. Supp. 2d at 1204-05.

The IDEA regulations define not only who is subject to administrative hearings but also the subject matter addressed at those hearings. This short list of permissible subjects suggests that the DPHO and AAO properly excluded NMPED from the hearings. *Cf. Fallis v. Ambach*, 710 F.2d 49, 55-56 (2d Cir. 1983) (holding that § 1415 does not contain procedures to address an unlimited scope of activities, like state-level funding decisions, but is focused on the proper classification of children).

A parent or public agency may initiate a hearing to address matters regarding the education of a particular child, i.e., "*any matter* relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(3), (6) (2000) (emphasis added); 34 C.F.R. §§ 300.503(a); 300.507(a)(1) (2004); NMAC 6.31.2.13(I)(3) (2004). As noted, the district court concluded that because NMPED had potential liability under the IDEA, the parents' claims belonged before the administrative officers. 614 F. Supp. 2d at 1204-05.

But, when the dispute arose that gave rise to the due process hearing, Tularosa had been directly responsible for M.C.'s education– NMPED had not. M.C.'s IEP team consisted of members of Tularosa and other educators, not representatives of the state. In fact, the parents, when writing NMPED of their grievances with Tularosa, specifically noted that they were keeping their complaint at a local level. Likewise, the statutory and regulatory terms that define

- 14 -

"any matter" include subjects related to the direct, ongoing education of a particular child. The individual terms "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child" are related to the adequacy of a child's education program as defined by his IEP which is developed by local educators, the child's parents, or other relevant specialists. *See* 20 U.S.C. § 1414(d)(1)(B)(iv) (2000) (the IEP team includes a representative of the LEA); (d)(4)(A), (d)(5) (the LEA is tasked with ensuring that the IEP team periodically reviews a child's IEP); N.M. Stat. Ann. § 22-13-5 ("School districts shall provide special education and related services appropriate to meet the needs of all children requiring special education and related services."); *see also Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1148-49, 1151 (10th Cir. 2008) ("Congress mandated that the States provide [IEPs] for all eligible disabled students, but then left the content of those programs entirely to local educators and parents, requiring only that they include 'a statement of measurable annual goals, including academic and functional goals, designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum' and meet the child's 'other educational needs.'"); *Bd. of Educ. of Cmty. High Sch. Dist. No. 218 v. Ill. State Bd. of Educ.*, 103 F.3d 545, 548 (7th Cir. 1996) ("Under IDEA case law developed by other circuits, the meaning of 'educational placement' falls somewhere between the physical school attended by

a child and the abstract goals of a child's IEP."); *Erickson v. Albuquerque Pub. Sch.*, 199 F.3d 1116, 1121-22 (10th Cir. 1999) (citing with approval the Seventh Circuit's definition in *Bd. of Educ. of Cmty. High Sch. Dist. No. 218*); Sen. Rep. No. 94-455, at 48 (1975) (Conf. Rep.) (explaining that notice shall be provided to the parents when the LEA or a state agency, *if it is providing direct services*, proposes to change the student's identification, evaluation or educational placement or to initiate a change in the FAPE provided to him); *but see* 20 U.S.C. § 1414(a)(1)(A) (explaining that an SEA, other state agency, or LEA "shall conduct a full and individual initial evaluation ... before the initial provision of special education and related services to a child with a disability"). NMPED declined to participate in the DPHO's proceedings because it was not directly involved in the development of M.C.'s IEP.

We agree with NMPED that it, as the SEA not involved in the actual provision of M.C.'s IEP, was properly exempted from the administrative process. Absent a determination that it was providing direct services to M.C., NMPED was not responsible for the matters covered by due process hearings.[5] *Cf. Wyner v.*

_____

[5] Effective June 2007, to conform with the 2004 re-authorization of the IDEA, New Mexico amended its administrative code to exclude from the IDEA administrative process "claims asserting that the department should be required to provide direct services to a child with a disability pursuant to 20 USC Sec. 1413(g)(1) and 34 CFR Sec. 300.227 because the responsible public agency is unable to establish and maintain appropriate programs of FAPE, or that the department has failed to adequately perform its duty of general supervision over educational programs for children with disabilities in New Mexico" and instead

(continued...)

*Manhattan Beach Unified Sch. Dist.*, 223 F.3d 1026, 1029-30 (9th Cir. 2000) (explaining that the hearing officer had no jurisdiction to consider the enforcement of a prior order because due-process hearings cover only subjects related to a child's IEP or FAPE and do not cover the enforcement of orders). While we address below whether NMPED should have been providing direct educational services to M.C. sometime during the IDEA administrative process, what matters for purposes of the DPHO's jurisdiction is whether NMPED actually *was* providing direct services. Just prior to the beginning of the administrative proceedings, Tularosa had developed an IEP for M.C. and had convened a meeting to attempt to address some of the parents' concerns. Since the NMPED was not involved in these activities, the DPHO and AAO properly excluded it from proceedings meant to address subjects related to direct education of a child. We note that this conclusion is somewhat unsatisfying, given that, as we describe below, it is the SEA itself that decides whether it should be providing direct services. That said, but, given the policy implications of requiring the SEA to intervene in all disputes when the parents claim the LEA is not providing their

[5](...continued)
directed parties with those claims to proceed under the state-complaint procedures. NMAC § 6.31.2.13(I)(3)(d) (2010); 6.31.2.7(B)(3) (department is defined as the "public education department"); N.M. Pub. Ed. Dept., Notice of Rule Making and Proposed Rules, 2007 N.M. REG TEXT 65879 (Feb. 28, 2007).

child a FAPE, we hold that the SEA need not have been part of the administrative process here and reverse the district court on this issue.

**D. The district court erred by holding NMPED liable for Tularosa's failure to provide M.C. a FAPE.**

The parties next join issue over whether NMPED breached a duty to provide a FAPE to M.C. by directly providing him educational services. In evaluating a claim of liability under the IDEA, this circuit undertakes a two-step review: "(1) Has the school district complied with the procedures set forth in IDEA? (2) Are the special education services provided to the student reasonably calculated to enable the child to receive educational benefits-or in other words, has the school district fulfilled its obligation to provide the student with a FAPE?" *Garcia v. Board of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982)); *Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1274-75 (10th Cir. 2007).

We first explain why we must decide this issue given that, ultimately, the district court awarded no relief. *See* 614 F. Supp. 2d at 1214-17. The district court awarded no remedy, despite its holding that NMPED violated the IDEA, because the parents asked for duplicative compensatory damages, had insufficient evidence of their out-of-pocket expenditures for M.C.'s homeschooling to support any possible award of reimbursement and because their requested hotline would

have no impact on the educational services provided to M.C. 614 F. Supp. 2d at 1216-17.

We note that the district court explicitly did not consider whether NMPED failed to provide an adequate continuum of alternative placements for M.C. and therefore did not award any relief based on that theory. 614 F. Supp. at 1213-14. It held that to address the issue, or to address whether NMPED had adequate monitoring processes, would require taking on the task of "forcing systematic changes to the way in which the NMPED operates." *Id.* at 1214. Moreover, the court noted that the parents did not forcefully advance the issue but, instead, suggested that the court "could, but need not, find NMPED failed ... to ensure a continuum of alternative placement to [M.C.]." *Id*. The district court therefore decided to limit its decision to claims upon which its jurisdiction was based; that is, whether NMPED failed in its duties to M.C. *See id*. Likewise, we agree that, assuming we agreed with its holding that the NMPED violated the IDEA, the district court did not abuse its discretion in declining to find that the NMPED failed to provide a continuum of services or failed in its monitoring obligations.

The district court also declined to award any other remedy for NMPED's violations of the IDEA. A district court has wide discretion to fashion relief in IDEA cases, 20 U.S.C. § 1415(i)(2)(B)(iii) (2000), and it exercised it in the present case to decline to award the equitable relief of ordering a hotline installed. We review equitable IDEA awards for abuse of discretion. *Garcia*, 520

F.3d at 1128-29. We agree with this decision because it would have had no effect on M.C.'s education. The problem in this case was not, as the district court noted, that M.C.'s concerns were unknown to NMPED but, rather, that, even after a phone call from the parents, NMPED failed to act. 614 F. Supp. 2d at 1216-17.

As to the request for reimbursement for M.C.'s mother's expenses while homeschooling M.C., the district court decided that there was insufficient evidence of those expenses and therefore declined to award relief even if, having found a violation of the IDEA, those expenses could have been reimbursed on the basis of more evidence. 614 F. Supp. 2d at 1216 ("While [Ms. Nelson] may have provided educational services – and the record does not adequately catalogue the extent or value of these services – she does not show that she paid out-of-pocket expenses."). The district court exercised its discretion to refuse to award relief because it found there was insufficient evidence. Since, however, the parents sought declaratory relief under the IDEA against NMPED and urged the court to hold that NMPED is responsible for a deprivation of a FAPE, we must decide that fundamental issue, which precedes the question of relief. 1st Am. Compl. ¶ VII.3.

The Supreme Court was equally divided over the issue whether a court may order a state to provide services directly to a child if the LEA fails to do so. *Honig*, 484 U.S. at 329. Therefore, since this is a matter of first impression in this circuit, we proceed by construing the statute that addresses whether an SEA must

directly provide a student a FAPE when the LEA is not providing one. We begin, as we must, with the statutory language:

> (h) Direct services by State educational agency
> > (1) In general. A State educational agency shall use the payments that would otherwise have been available to a local educational agency or to a State agency to provide special education and related services directly to children with disabilities residing in the area served by that local agency, or for whom that State agency is responsible, if the State educational agency *determines* that the local education agency or State agency, as the case may be--
> > > (A) has not provided the information needed to establish the eligibility of such agency under this section;
> > > (B) is unable to establish and maintain programs of free appropriate public education that meet the requirements of subsection (a) of this section;
> > > (C) is unable or unwilling to be consolidated with one or more local educational agencies in order to establish and maintain such programs; or
> > > (D) has one or more children with disabilities who can best be served by a regional or State program or service-delivery system designed to meet the needs of such children.
> > (2) Manner and location of education and services. The State educational agency may provide special education and related services under paragraph (1) in such manner and at such locations (including regional or State centers) as the State agency considers appropriate. Such education and services shall be provided in accordance with this subchapter.

1413(h) (2000) (emphasis added); *see also* 34 C.F.R. § 300.360 (2002).

The district court thoroughly examined the meaning of the ambiguous word *determine* to conclude that the SEA need make no formal decision or finding that the LEA was not complying with the statute but, rather that the word "determine" was best read to mean "finding out." This definition could comfortably apply to each of the four situations listed under § 1413(h)(1) and, the district court

reasoned, a word used in a statutory enactment should have the same meaning for each use. 614 F. Supp. 2d at 1208-09. Although this reasoning is plausible, for present purposes, we shall assume without deciding that "determining" means "finding out."

The district court ultimately concluded that NMPED had plenty of time to provide direct services in the period between the inception of the dispute between the parents and Tularosa in the fall of 2003 and the start of administrative proceedings in May 2004, but, instead, it actively supported Tularosa's position that it had no obligation to cross the threshold of the parents' home. 614 F. Supp. 2d at 1211-13. The district court, relying on *Doe v. Maher*, 793 F.2d 1470, 1491 (9th Cir. 1986), *aff'd by an equally divided court sub nom. Honig v. Doe*, 484 U.S. 305 (1988), as persuasive authority and the language, structure and history of the IDEA, explained that, although Tularosa was not "unable" to meet M.C.'s needs (upholding the factual determination of the AAO), it was "unwilling," (although this finding was not explicitly tied to facts beyond the obvious fact that Tularosa did not help the parents to get M.C. out of their home, citing *Maher*) and, therefore, NMPED should have directly provided a FAPE. 614 F. Supp. 2d at 1211; *Maher*, 793 F.2d at 1492 ("It would seem incontrovertable [sic] that, whenever the local agency refuses or wrongfully neglects to provide a handicapped child with a free appropriate education, that child 'can best be served' on the regional or state level.'"). *Maher* held that an SEA was required to

- 22 -

intervene directly if the LEA is failing to do so, the SEA had notice of non-compliance and the SEA had a reasonable opportunity to compel compliance before an order was imposed against it. *Maher*, 793 F.2d at 1492. *Maher* did not specify the form of this notice. *Maher* relied on the predecessor provision to 1413(h)(1)(D) that, as it does now, requires the state to step in if the LEA has "1 or more children with disabilities who can best be served by a regional or State program or service delivery system designed to meet the needs of such children." Applying *Maher*, the district court held that NMPED was afforded a reasonable opportunity to compel local compliance because of the length of the administrative proceeding and, under (D), the state was required to provide direct education at either a regional or state level. 614 F. Supp. 2d at 1213.

The statute, however, does not apply to the present facts. Situations (A) and (C) are clearly not applicable and, NMPED did not either formally determine or "f[ind] out" that (B) a regional or state delivery system was necessary or (D) one or more students could best be served by a state or regional program. As the district court concluded, after reviewing the administrative officers' factual findings and receiving further testimony at an evidentiary hearing, Tularosa could, with professional help, implement the AAO's order and provide a FAPE to M.C. 614 F. Supp. 2d at 1210-11. *Cf. Garcia*, 520 F.3d at 1125 (the factual findings in an IDEA administrative record are "considered *prima facie* correct") (internal citations omitted). Instead, the AAO held that Tularosa had failed to

provide M.C. a FAPE but that Tularosa would be able to directly provide education to M.C. with some extra assistance. In addition, at no point did NMPED "find out" that M.C. could "best be served by a regional or State program or service-delivery system designed to meet the needs of such children." In reaching its result, the district court merely assumed that, applying *Maher*, "whenever the local agency refuses or wrongfully neglects to provide a handicapped child with a free appropriate education, that child 'can best be served' on the regional or state level." 793 F.2d at 1492.[6] There was, however, no finding that M.C. could be best served by state or regional programs. *Cf.* § 1413(h).

In this vein, we note with approval the actual injunction entered by the district court in *Maher* that permanently enjoined the SEA to directly provide services when "for example, the [LEA] fails either to develop or implement an IEP determination, and also fails properly to appeal such determination to the [SEA]." 793 F.2d at 1502 (including the district-court opinion in an appendix).

---

[6] The statutory language in § 1413(h)(1) describing when a SEA must intervene does not explicitly apply to a situation where the LEA is able, but merely unwilling, to provide a FAPE. *Compare* § 1413(h)(1)(B) (the LEA "is unable to establish and maintain programs of [FAPE]") *with* § 1413(h)(1)(C) (the LEA "is unable *or unwilling* to be consolidated") (emphasis added). The district court relied on *Maher* for the proposition that "whenever the local agency refuses or wrongfully neglects to provide a handicapped child with a [FAPE], that child 'can best be served' on the regional or state level." 793 F.2d at 1491-92. Thus, the district court read the statute to impose an obligation to intervene upon the SEA in a situation, like this one, in which the LEA is able but unwilling to provide a FAPE. We need not opine on the validity of this reasoning, because it suffices for our purposes to hold that there was no determination by the SEA that any of the scenarios described in the subsections of § 1413(h)(1) applied.

- 24 -

Thus, even the injunction approved by the Ninth Circuit suggests some recourse to the administrative process before the SEA is required to provide direct educational services. Certainly, LEAs are not infallible and may play a role in mistakenly crafting IEPs – the larger failure is, however, if the administrative process breaks down and the student languishes without any hope that a process set in motion by either the parents or some other party may lead to a solution. In the present case, as soon as the parents were ready to formally object to M.C.'s IEP, the administrative procedure began and the parents kept their son home-schooled without seeking an injunction or other remedy to have him placed elsewhere during that time. *Cf. Maher*, 793 F.2d at 1477 (describing that the district court granted a temporary restraining order and then a preliminary injunction enjoining the LEA from excluding the student from school, within days of the expulsion, while efforts were made to find him an alternative placement). And, as we have noted, for these procedures to work, they must be given time: the IDEA does not provide "immediate" relief:

> Potentially, relief is available to the plaintiffs under the IDEA. Relief is available whenever the plaintiff could attain "relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers." ... The "dispositive question generally is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies." ... We do not determine the availability of the relief based on the immediate ability of a plaintiff to attain it, recognizing that "a child may have to go through several procedural steps to take advantage of that remedy."

*Ellenberg*, 478 F.3d at 1276 (internal citations omitted).

The parties argue that the larger context of the statute supports their interpretation of 1413(h). The parents contend that IDEA provisions should be construed in light of the overarching Congressional concern that individual students may be neglected because of regulatory spaces between the jurisdictions of multiple agencies with responsibility for disabled children's education.

While we agree that it is apparent that the IDEA centralizes responsibility for assuring that the requirements of the Act are met in the SEA, this is not the end of the story. 20 U.S.C. § 1412(11) (2000) ("The [SEA] is responsible for ensuring that ... all educational programs for children with disabilities in the State, including all such programs administered by any other State or local agency ... meet the educational standards of the [SEA]."); *see* S. Rep. No. 168, 94th Cong., 1st Sess. 24 (1975) *reprinted in* (1975) U.S.C.C.A.N. 1425, 1448 ("The committee bill requires that the [SEA] be responsible for insuring that all requirements of the Act are carried out, that all education programs for handicapped children within the State, including all such programs administered by any other State or local agency, must meet State educational agency standards and be under the general supervision of persons responsible for education of handicapped children."). As noted, the IDEA is primarily a funding statute and the SEA controls some of the purse strings. Should the SEA decide that an LEA is not deserving of funding because it is failing its students with disabilities, the

SEA may not, in furtherance of its ultimate responsibility for the education of children in the state, simply yank funding from an LEA without further ado. *Cf.* § 1413(h) ("A[n] [SEA] shall use the payments that would otherwise have been available to a[n] [LEA] ... if the [SEA] determines ..."). Instead, the SEA is required first to provide notice and a hearing to the LEA before it determines that it is failing to comply with a requirement of the Act. 20 U.S.C. § 1413(d)(1) (providing for notice and a hearing); § 1413(a)(3) (the LEA shall ensure that its personnel are appropriately and adequately prepared); *cf.* § 1232c(b)(2) (providing for notice and time for the LEA to show cause why the funding should not be suspended for failure to substantially comply with several IDEA requirements); 20 U.S.C. § 1412(a)(13)("The [SEA] will not make a final determination that a[n LEA] is not eligible for assistance under this subchapter without first affording that agency reasonable notice and an opportunity for a hearing").

As we noted above in the section considering whether NMPED should have been included in the administrative proceedings, revisions to the educational services provided a student with disabilities are addressed through modifications of a child's IEP, made by reconvening the IEP team. That is, the SEA cannot unilaterally change the IEP. 20 U.S.C. § 1414(d)(5) (2000) ("If a participating agency, other than the local educational agency, fails to provide the transition services described in the IEP in accordance with paragraph (1)(A)(vii), the local

educational agency shall reconvene the IEP Team to identify alternative strategies to meet the transition objectives for the child set out in that program."); *see also* NMAC 6.31.2.11(B)(2). The SEA can, however, as the parents point out, order the IEP team to meet to develop a plan to provide a FAPE. Given the central focus of the IDEA on the IEP and on the procedural mechanisms for addressing grievances through the IEP team and due process proceedings, it seems inconsistent with the statutory structure to allow the state to run roughshod over these procedures simply because parents contend that an IEP is not providing their child a FAPE. We recognize, however, that the district court here was strongly influenced by the impasse resulting from the child's refusal to leave his house and the school district's refusal to extract him, a situation that blocked educational progress for perhaps an unconscionable time.

We note also that our conclusion denying inculpation of the state is in some tension with holdings affirmed by the Third, Ninth, and Eleventh Circuits although, ultimately, we find them distinguishable. In *Georgia Association of Retarded Citizens v. McDaniel*, the Eleventh Circuit eventually affirmed as modified a district court decision in which the court explained that § 1414(d) of the Educational for all Handicapped Children Act (EHA) (predecessor to the IDEA's § 1413(h)) requires the state to directly provide education in certain circumstances, but the district court rested its conclusion that the SEA violated the IDEA on the SEA's de facto policy restricting LEAs from providing more

than 180 days of schooling– a conclusion not based directly on the "determines" language of the EHA. *See* 511 F. Supp. 1263, 1278-79 (N.D. Ga. 1981), *aff'd as modified by* 740 F.2d 902, 903 (11th Cir. 1984). Likewise, the Third Circuit stated the general proposition that an SEA may be required to provide direct services, but noted that the district court did not hold that the SEA was directly responsible for providing a child educational services, only that it was required to make sure that plans for providing a FAPE to all children with disabilities in the state were implemented. *Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687, 696-97 (3d Cir. 1981) (applying § 1412 (which is not the predecessor to § 1413(h)), which, at the time, provided that the SEA shall ensure that the "requirements of this subchapter are carried out" and all programs administered by other state agencies or an LEA "will be under the general supervision of the persons responsible for educational programs for handicapped children in the [SEA]"); *cf. S-1 v. Turlington*, 635 F.2d 342, 350 (5th Cir. Unit B Jan. 1981) (holding that the state had the right to intervene in local disciplinary proceedings involving a child with disabilities because of its general responsibilities for education in the state, construing the predecessor to § 1412(11), cited above), *overruled on other grounds by Honig v. Doe*, 484 U.S. at 317.

We take no position on the Ninth Circuit's holding in *Maher*, but even if we adopted it, we would not find that holding to be applicable here because the case is factually distinguishable. The only notice the SEA had in the present case

was an informal letter, advising the state that the parents were keeping their dispute at the local level and a brief phone call about complying with the due process hearing procedures to challenge Tularosa's IEP. We believe that the SEA was not on notice of non-compliance such that it should have attempted to take over education for the LEA without allowing the structured evidentiary hearings provided by the Act to run their course. M.C.'s situation seemed to strongly indicate that he was not receiving a FAPE based on the fact that he was not in school and, significantly, had been dropped from the rolls. That said, however, given the administrative protections built into the IDEA for both the parents and the LEAs and SEAs, "notice" derives from something more than what occurred here--initial bits of information provided well before recourse to the administrative process. Moreover, *Maher* presented more extreme facts. For example, the local school summarily expelled the student and the local agency involved in the *Maher* case refused to convene an IEP meeting until it was ordered to do so by the district court.

While we here hold that NMPED was not required by the IDEA to provide educational services directly to M.C., we cite with approval cases from other circuits holding that the state may still be financially responsible for an LEA's failure to provide a disabled child a FAPE. *See, e.g.*, *St. Tammany Parish Sch. Bd.*, 142 F.3d at 783-85 (reviewing the district court's interim award for an abuse of discretion); *Gadsby*, 109 F.3d at 955-56 (remanding to allow the district court

to fashion an award and holding that the SEA may be liable for reimbursement costs). At oral argument, one of our panel members noted that it is often an unsatisfactory victory when a court holds that the subsidiary is liable but simultaneously concludes that the deep-pocketed parent corporation is not. In the case of the IDEA it seems well-established that the parent corporation, the SEA, is indeed potentially financially responsible for an LEA's failure to comply with its responsibilities, within the broad discretion of a district court. The SEA is, however, not required to take over education directly. In the present case, NMPED did reimburse Tularosa for some of its M.C.-related compensatory education costs (recall that NMPED reimbursed $146,000 of the $165,000 it cost to educate M.C. while implementing the AAO's order). And, because we approve of the district court's decision not to award any reimbursement for Ms. Nelson's costs of educating M.C. because she did not provide supporting evidence and its discretionary decision not to award any other remedy, we need not remand for the district court to determine whether to require NMPED to reimburse Tularosa for her costs.[7]

---

[7] The parents do argue in a footnote to their opening brief that the IDEA "could equally well support an interpretation that remedy ordered against one public education agency is simply a collateral source which should not be considered in determining equitable remedy against a second educational agency at fault for the same deprivation of FAPE." Appellant Br. at 37 n.15. Assuming this argument is sufficiently well developed to be considered, we respectfully disagree with the parents' assertion. As discussed in the paragraph above, the extant caselaw on the subject suggests that allowing the same recovery against

(continued...)

This is a most unusual case because M.C. was home-schooled for a significant period of time because of behaviors stemming from his autism and *dropped from the school rolls*. The district court noted that allowing months and years to pass before NMPED intervenes is contrary to the main purposes of the IDEA, which was designed to make sure that all children with disabilities were provided free education in the public schools. We certainly agree that there might be a different case where the administrative procedure extends, without interference by the parents, until it becomes apparent that the child is languishing due to unnecessary and excessive delay, so that the state must act, especially when faced with a straightforward parental demand for SEA intervention combined with an obvious failure of the system. This is not quite that case.[8]

---

[7](...continued)
two agencies is not contemplated under the statute, especially given the hierarchical relationship of the LEA and the SEA discussed at length above (and described by the parents).

[8] We are comforted somewhat by regulatory amendments that post-date the relevant authority in this case. The applicable regulations now state that the SEA must remedy any non-compliance identified under its monitoring obligations within one year. *See* 34 C.F.R. § 300.600(e) (2010). In addition, New Mexico has shortened its administrative process. Under the regulations in place during the Chavez's administrative review, a request for an appeal needed to be transmitted within 30 days of the hearing-officer's decision and a decision on that appeal needed to be issued 30 days thereafter. NMAC 6.31.2.13(I)(16)(b), (d) (2000). Now, a civil complaint must be filed within 30 days of a due-process-hearing officer's decision, without a second-level administrative review. NMAC 6.31.2.13(I)(25)(a) (2007).

And, in a different case where the parents were more confident that, from the outset, their child was deprived completely of a FAPE, they might have been able to file a federal court action for an injunction much earlier, noting the clear, imminent harm if a child is not provided any education by his LEA during the administrative process. This is a difficult and frustrating case, where we have sought to balance useful procedural requirements with the need for expedition. We do not, however, intend to signal state agencies that they may routinely rely on procedural requirements to insulate them from all liability, where the statutory remedies have run off the rails.

**E. The parents' appeal.**

Because we reverse the district court's holding that NMPED failed to comply with the IDEA and, furthermore, uphold its decision to decline to award relief, the attorneys' fees issues is now moot.

The district court is therefore AFFIRMED in part and REVERSED in part, consistent with this opinion. Each party is to bear its own costs on appeal.